**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

UNITED STATES OF AMERICA,

     v.

JUAN MARTINEZ,

     Defendant.

CASE NO.: 4:22-cr-170

**O R D E R**

This case involves aerospace engineering.  Fear not, fellow legal practitioners and history majors.  The only engineering acumen necessary to understand this Order is that square pegs do not fit into round holes.

A jury found Defendant guilty of conspiring to convert an established aircraft manufacturer's trade secrets in connection with Defendant's work for an aerospace startup. Defendant now moves for a new trial insisting that the Court prejudiced his defense by barring his counsel from asserting a legal impossibility defense during closing argument.  He contends that, regardless of his and his coconspirators' intentions, it was impossible for them to convert the aircraft manufacturer's trade secrets because the manufacturer authorized them to use its proprietary information.  Yet, while Defendant hammers at his argument with hyperbole and hypothetical, it does not fit into the exceedingly narrow hole of legal impossibility.  Rather, his argument squarely takes the form of factual impossibility, which he admits is not a proper defense. Moreover, even if Defendant had presented a legal impossibility argument, multiple independent grounds still make his argument legally untenable.  Even assuming his impossibility argument was legally tenable, it would have been for the Court, not the jury, to decide.  Furthermore, even if Defendant could clear these obstacles, his argument had no factual support.  Consequently, the

Court acted well within its discretion by disallowing Defendant's impossibility argument. Therefore, the Court **DENIES** Defendant's Motion for a New Trial, (doc. 125).

## BACKGROUND

### I.  Factual Background

Defendant is an accomplished mechanical design engineer.  (Doc. 138, pp. 47–132.)  His decades-long career includes three stints as an engineer for aircraft manufacturer Gulfstream Aerospace Corporation ("Gulfstream"), in Savannah, Georgia.  (Government's Trial Exhibit ("Gov. Tr. Exh.") 47.)  In 2017, Defendant worked at aerospace company Northrop Grumman Corporation in Melbourne, Florida.  (Id.)  During Defendant's employment at Northrop Grumman, he became involved with a separate startup company, APAC Airplane Design Consulting, LLC ("APAC").  (Doc. 138, p. 132.)

APAC was an aircraft consulting company started by Tony Chee.[1]  At the time Defendant became involved with APAC, the company was attempting to develop a new technology for preventing ice from forming on airplane wings.  (Id. at p. 133.)  In October 2017, Gilbert Basaldua, then a Gulfstream employee who was also affiliated with APAC, initiated a meeting between APAC and Gulfstream.  (Doc. 137, pp. 14–15.)  Basaldua did not inform Gulfstream of his involvement with APAC.  (Id. at pp. 17–18.)  During the meeting, APAC representatives Chee, Craig German, and Joseph Pascua presented APAC's proposed anti-ice technology to Gulfstream employees.  (Id. at pp. 14–19; Joint Trial Exhibits ("J. Tr. Exhs.") 6, 9.)

Following that presentation, Gulfstream issued a Request for Information ("the RFI") to APAC to obtain additional information regarding the technology.  (Doc. 137, p. 19; J. Tr. Exh. 22.) The RFI provided, among other things,

---

[1] Unfortunately, Mr. Chee is no longer with us as he passed away before the trial.

> All information, documents and specifications furnished by Gulfstream in this RFI, and the RFI itself, are Gulfstream confidential, and may not to be used for any other purpose than the intended purpose which is the solicitation of a proposal from the bidder by Gulfstream. Bidder accepts this confidentiality notice and its obligation to maintain the confidentiality of Gulfstream information, documents and specifications under the terms and conditions of the existing proprietary information agreement in place between the two parties, and as referenced here.

(J. Tr. Exh. 22, p. 6.)

In connection with the RFI, Gulfstream and APAC entered into a Proprietary Information Agreement ("the PIA") to govern the sharing of confidential information between the companies.

(Doc. 137, p. 29; J. Tr. Exh. 21.) Section 1 of the PIA stated,

> The purpose of this Agreement is to set forth the rights and obligations of the Parties with respect to the use, handling, protection, and safeguarding of PROPRIETARY INFORMATION which is disclosed by and between the Parties hereto for the purpose of exchanging technical information and proposals related to the wing leading edge components and Installation for power consumption for potential use on the G650 aircraft (the "Permitted Purpose").

(J. Tr. Exh. 21, p. 1.) Section 3A of the PIA bound the parties to protect information that was shared under the agreement as follows,

> PROPRIETARY INFORMATION may not be disclosed to any third party without the express written consent of the Disclosing Party. Copies or reproductions, in whole or in part, of PROPRIETARY INFORMATION or documents which incorporate PROPRIETARY INFORMATION must be marked by the Receiving Party according to this Agreement, and such copies may only be made to the extent required for that Party to perform its obligations under this Agreement.

(Id. at p. 2.) As for the use of propriety information, the Section 4A of the PIA provided,

> The Receiving Party will: (i) use PROPRIETARY INFORMATION solely in furtherance of the Permitted Purpose with the Disclosing Party; (ii) limit disclosure of PROPRIETARY INFORMATION to its' [sic] employees, contract personnel and consultants who are bound by and have been made aware of the restrictions contained herein concerning the use of the PROPRIETARY INFORMATION and who have a "need to know" in order to carry out their respective functions in connection with the Permitted Purpose.

(Id. at p. 4.)  Section 7 of the PIA specified that "[n]either Party has an obligation to disclose PROPRIETARY INFORMATION hereunder."  (Id. at p. 6.)  Section 13 stated that nothing in the PIA "shall supersede or in any way modify any of the terms and conditions, or the rights and obligations of the Parties, included in any other agreements."  (Id. at p. 7.)  In Section 15 of the Agreement, the parties designated "the specific points of contact for disclosing and/or receiving written PROPRIETARY INFORMATION transmitted between the Parties:" Meghan Wright on behalf of Gulfstream and Chee, German, and Pascua on behalf of APAC.  (Id. at p. 8.)

After execution of the PIA, Gulfstream and APAC shared information germane to the RFI. (Doc. 137, pp. 23–25, 33; J. Tr. Exh. 23.)  Wright shared files on behalf of Gulfstream using a secure online portal known as Ariba.  (Doc. 137, pp. 23–25.)  Prior to disclosing those documents, Gulfstream engineers removed proprietary information that Gulfstream was unwilling to share. (Id. at p. 33.)  Ultimately, in December 2017, Gulfstream decided that it was not interested in pursuing a relationship with APAC.  (J. Tr. Exh. 23, pp. 31–32.)  On January 8, 2018, Wright emailed German,

> Gulfstream appreciates APAC's quick response and participation with the RFI. However, for current GAC programs and near production programs we are not pursuing new anti-icing technology at this time.  Internal efforts are being initiated for possible future programs, which we are not able to discuss with APAC at this time.  When those future developments mature there may be possible next steps, in which GAC will initiate conversations.
> If you have further questions and/or comments please contact me directly. Engineering requested all communication come through myself/procurement first and I will be sure to pass along any further action items, so please do not contact them directly.

(J. Tr. Exh. 24.)  APAC had no formal dealings with Gulfstream after this email.  (Doc. 137, p. 40.)

Defendant became informally involved with APAC in the summer of 2017, when the company was pitching their anti-ice technology to Honda Aircraft Company.  (Doc. 136, p. 117.) Basaldua approached Defendant on behalf of APAC, and Defendant knew Basaldua was also

working at Gulfstream at that time.  (Doc. 138, pp. 132–34.)  In November 2017, Defendant also helped APAC draft responses to Gulfstream's questions set forth in the RFI.  (Id. at pp. 132–36; J. Tr. Exh. 103.)  Like Gulfstream, Honda Jet ultimately relayed to APAC that the company was not interested in APAC's technology, and it also advised that APAC needed to obtain certification for its proposed anti-ice system from the Federal Aviation Administration ("FAA").  (Doc. 136, pp. 117–18.)  To that end, APAC sought to test its technology in a wind tunnel, and realized it needed the assistance of someone with expertise in such tests.  (Id. at pp. 117–120; J. Tr. Exh. 36, pp. 1, 6–7; Gov. Tr. Exh. 62.)  APAC identified Defendant as that expert and, in February 2018, asked him to develop a plan for a wind tunnel test of an airplane wing that APAC would obtain and equip with APAC's technology.  (Doc. 138, pp. 133–35, 139.)  APAC eventually found a Gulfstream wing to use as the test article.  (Id. at p. 257.)

Defendant testified that he understood Basaldua to be the "point of contact" between Gulfstream and APAC.  (Id. at pp. 158–59.)  When Defendant wanted Gulfstream documents to help develop the wind tunnel test plan, he contacted Basaldua and requested those documents from him.  (Id.)  Basaldua provided numerous Gulfstream technical documents to Defendant.  (See, e.g., J. Tr. Exhs. 10, 20.)  Basaldua emailed Gulfstream's documents from his Gulfstream email account to his own personal email account and then emailed the documents from his personal account to Defendant's personal email account.  (See, e.g., J. Tr. Exhs. 19, 20.)  On March 27, 2018, Basaldua emailed Defendant and Pascua a Gulfstream document titled "Anti-Ice Test Document" from his personal email account and told the recipients, "Here you go guard this, my job depends on it."  (J. Tr. Exh. 10.)  On November 27, 2018, Basaldua emailed Defendant a Gulfstream document titled "Icing Research Tunnel Test Report."  (J. Tr. Exh. 20.)  Basaldua named the subject matter of the

email and the attachment containing Gulfstream's proprietary documents "Time Card" even though the email and attachment contained no timecard information.  (Id.)

At trial, Defendant admitted that he "received emails with attachments called timecard far more than once from Mr. Basaldua," that he received such emails "on a fairly routine basis," and that the attachments were not in fact timecards but instead documents containing Gulfstream's proprietary data.  (Doc. 138, pp. 235–39.)  Defendant admitted that the information contained in the Gulfstream documents that Basaldua provided him contained trade secrets.  (Id. at pp. 224–25, 236.)  Basaldua also provided Defendant three separate anti-ice test plans from one of Gulfstream's competitors, HondaJet, that Basaldua had received from Craig German for use in developing APAC's tunnel test plan.  (Id. at pp. 233–34.)  Defendant testified that he and Basaldua used "tradecraft" methods to disguise proprietary information when emailing it, including labeling a computer file that contained Gulfstream proprietary information as "school test."  (Id. at pp. 264–65.)  Defendant also stated that he knew Basaldua had a financial interest in APAC, and he knew that, at least early on, Basaldua had not disclosed his relationship with APAC to Gulfstream.  (Id. at pp. 212, 215–16.)

Defendant testified that APAC's plan was to use the data gleaned from the wind tunnel test as proof of concept of APAC's technology so that APAC could then use that proof when marketing the technology to a variety of aircraft manufacturers including Gulfstream's competitors.  (Id. at pp. 270–72, 276–81.)  Defendant admitted that he told law enforcement agents that "the reason APAC wanted this Gulfstream data was simply to get its FAA-certified data so it could market the anti-ice project to numerous aircraft companies."  (Id. at p. 277.)  He conceded that if APAC had successfully developed a proof of concept, Gulfstream's competitors might have bought the technology.  (Id. at p. 278.)  Defendant also admitted that he sent Gulfstream's proprietary data to

numerous people whom he knew had no right to view or use that data.  (Id. at pp. 274–76.)  For instance, Defendant agreed that he had sent APAC's test plan to a friend and asked him to "wordsmith" the plan so that it did not look as though it contained Gulfstream information.  (Id. at pp. 272–74.)

After Gulfstream received an anonymous complaint, which was eventually determined to have been sent by Craig German, law enforcement authorities approached Basaldua and questioned him regarding APAC's activities.  (Doc 136, pp. 93–94.)  On November 30, 2018, agents arranged for Basaldua to make a recorded phone call to Defendant.  (J. Tr. Exhs. 37, 38.)  At trial, Defendant testified that this phone call was the first time he realized something was amiss regarding APAC's taking and use of Gulfstream's documents.  (Doc. 138, pp. 181–82, 265–69, 273–74, 299–300.)  Defendant agreed that on the date of the phone call, he learned that Basaldua "had been stealing Gulfstream information."  (Id. at p. 299–300.)  He testified that during and after that phone call, he and Basaldua agreed to remove the evidence of APAC's use of Gulfstream's intellectual property.  (Id. at pp. 269–70, 274.)  However, removing all of Gulfstream's proprietary information was impossible, and, therefore, Defendant agreed that he left Gulfstream's trade secret information in the test plan even though "at that point [he] knew something was wrong and that [Basaldua] might have stolen it."  (Id. at pp. 300–01.)  Defendant subsequently sent Chee a test plan which APAC submitted to the FAA.  (Id.)  The test plan contained Gulfstream's proprietary data because Defendant knowingly left that data in the plan.  (Id.)

## II.    Procedural History

On November 2, 2022, the Grand Jury of this District indicted Defendant on one Count of Conspiracy to Steal Trade Secrets in violation of the Economic Espionage Act of 1996 ("EEA"),

18 U.S.C. § 1832(a)(5).[2]  (Doc. 1.)  The Court held a five-day jury trial on that Indictment from August 14 to August 18, 2023.

After the close of the Government's case in chief, Defendant made an oral Motion for Dismissal or Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29.  (Doc. 137, pp. 230–43.)  Defendant offered two arguments in support of that Motion.  (Id.)  Chiefly, Defendant argued that he could not have conspired to convert Gulfstream's proprietary documents because "the uses to which [Defendant] is alleged to have been putting these documents, namely, preparing a wind tunnel testing plan, were squarely within the scope of what the [PIA] allows and contemplates."  (Id. at pp. 231–32.)  Defendant also argued that the Government had not presented

---

[2] The EEA provides:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly--
>> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
>> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>> (4) attempts to commit any offense described in paragraphs (1) through (3); or
>> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,
>
> shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.
>
> (b) Any organization that commits any offense described in subsection (a) shall be fined not more than the greater of $5,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided.

18 U.S.C. § 1832.  While the EEA is often referred to as a prohibition on "theft of trade secrets," the statute proscribes numerous acts (i.e., stealing, taking, carrying away, copying, duplicating, transmitting, sketching, receiving, possessing).  For ease of reference, rather than continually reciting this litany of acts, in this Order the Court will use the terms "convert" and "misappropriate" to denote the doing of any of these acts without authorization and will use the phrase "take, possess, and use" to denote doing these acts with or without authorization.

sufficient evidence of his *mens rea*.  (Id. at pp. 239–43.)  The Government argued in opposition to Defendant's Motion, (id. at pp. 243–56), and Defendant replied and contended that "contract interpretation is a matter for the Court.  The Court, and in this case not the jury, is charged with interpreting this contract and applying the contract to the facts of the case," (id. at p. 256).

The Court gave its initial thoughts on the Rule 29 Motion but afforded the parties an opportunity to file written briefs and then recessed for the day.  (Id. at pp. 259–62.)  In his written brief, Defendant contended that "this is a paradigmatic case of legal impossibility."  (Doc. 106, p. 4.)  He argued, "[i]f the PIA actually authorized [Defendant] to have these documents and use them for the windtunnel test—which it did—then his conspiring to obtain them is not criminal conspiracy because it 'would not be another Federal crime if it was actually carried out.'"  (Id. at p. 6 (quoting Pattern Crim. Jury Instr. 11th Cir. OI O13.1 (2020).)  In its brief, the Government argued that impossibility, legal or factual, is not a defense to a conspiracy charge, and that even if impossibility was a defense, no impossibility existed as to the crime charged in this case.  (Doc. 107, pp. 1–7.)

Upon opening court the next day, the Court issued a lengthy oral order denying Defendant's Rule 29 Motion.  (Doc. 138, pp. 5–19.)  The Court stated that "distinct from proving *mens rea*, that is, what the defendant believed the facts to be, defendant contends the government has to prove illegality of the facts as they were."  (Id. at p. 6.)  The Court explained that this line of reasoning was incorrect under "legions of case law."  (Id.)  The Court also held that though Defendant contended his argument was one of legal impossibility, "at its heart, it is not.  It's a factual impossibility argument."  (Id. at pp. 6–7.)  Additionally, the Court summarized "[b]inding and persuasive authority, from within and outside the Eleventh Circuit, [that] refute[s] defendant's line of reasoning."  (Id. at pp. 8–12.)  Further, the Court held that even if the Government had to prove

that the PIA did not authorize Defendant to possess the documents, the Government had produced

sufficient evidence to sustain a conviction on that issue.  (Id. at pp. 13–16.)

Defendant's proposed legal impossibility defense became an issue again as the parties

prepared for closing arguments.  The Government's counsel argued,

> In the Rule 29 motion, the Court found as a matter of law that the PIA did not -- it's
> irrelevant absent some showing that the defendant knew about it or it had an effect
> on his state of mind.  What the government is concerned about is in closing the
> defense arguing that the PIA somehow gave the APAC individuals as a matter of
> law the right to possess all of this information.  I think the Court's ruling is correct
> on that issue, that it did not.  And even if it did, it's irrelevant, and we would ask
> the Court to preclude that line of argument and admonish the defense counsel to
> refrain from making it.

(Doc. 139, p. 47.)  In response and upon questioning from the Court, defense counsel stated,

> And I understand the Court wants me to address head on the question of whether I
> should be permitted to say they were -- they had the legal right to have these.  I
> think the answer to that has to be yes. I don't know that I'm going to say that,
> frankly.  I'm not sure that I want to, but I mean, I think I have the right to.  I think
> the Constitution gives me the right to say, this is a piece of evidence, this is what
> we ask that you think about when you are considering it.  And I'm trying to think
> if I could even -- or should I even contemplate being amenable to a potential
> compromise such as I won't say as a matter of law they had a right to have it.  I
> understand the concern.

(Id. at pp. 48–49.)  Counsel continued, "I think I should be entitled to put the legal impossibility

argument to the jury, and I understand that the Court did not accept that argument in the Rule 29

motion, but I do not believe that that constitutes a preclusion of the defense making it to the jury."

(Id. at p. 53.)  After hearing from the parties at length, the Court granted the Government's request

and ruled,

> The jury charges that have been agreed upon state, 'As I stated above, the
> government need not prove that the defendant actually knew the anti-ice and wing
> model information met the legal definition of a trade secret with regard to that
> element of the offense.  The government need only show that the defendant believed
> that the rightful owner of the information treated the information as secret and also
> that the defendant believed that he or one of his alleged co-conspirators was taking
> the information without authorization from its rightful owner.'

. . . And, again, the defendant here is charged with a conspiracy; and as the case law teaches us, the impossibility of completing the crime because the facts were not as the defendant believed them to be is not a defense to a conspiracy. That's United States v. Williams, [553 U.S. 285, 300 (2008)], [United States] Supreme Court case from 2008.

Here, the defendant's argument about why he would be able to put this to the jury continues to boil down to an impossibility argument, that is, that it was objectively impossible for he and his co-conspirators to take the documents without authorization because the agreement authorized them to take the documents. It's not a legal impossibility. That's a factual impossibility argument, and that would be an improper argument. In other words, he's arguing that -- he wants to argue to the jury, look, they could not have conspired to steal the documents because factually Gulfstream had already authorized APAC to take the documents. That's -- again, that's an impossibility argument that's not proper in a conspiracy case. If he had been charged with theft of trade secrets, that might be an issue, but that's not the case before us.

Moreover, even if it was a legal impossibility, there's some cases that prescribe that that's not a proper defense in a case like this because it's not really a pure legal impossibility argument.

Additionally, we have loads of evidence about the agreement, and by all means, the parties can discuss the agreement in the close. Definitely, they can discuss the agreement, because if nothing else, perhaps it informs the co-conspirators' state of mind, and perhaps it informs the reasonable course of dealings and things like that. But you can't argue, look, it was legally impossible, or it was impossible, rather, for them to take the documents without authorization because of this contract that the defendant did not even know about. That would be improper. That's not appropriate with the law of conspiracy.

(Id. at pp. 55–57.) The Court explained that the United States Court of Appeals for the Eleventh Circuit had disallowed a defense in United States v. Petit, 841 F.2d 1546, 1550 (11th Cir. 1988), that was "almost on fours" with Defendant's argument. (Id. at p. 58.) The Court continued,

. . . And so that would be an improper argument before the jury to argue that, you know, he could not have conspired to do this, because even if he did it, it would not have been a crime, and that's essentially what the argument boils down to. And cases say that's just not -- that's not the way we go. Okay?

All right. So that's my ruling. You can't argue to the jury, [']Members of the Jury, this document gave them -- he could not have committed the crime because this document gave him authorization so even if he had done it, it would not have been a crime.[']

(Id. at pp. 55–59.) Defense counsel then stated, "I had no plans to say legal impossibility to the jury" but asked whether he was precluded "from saying it would have been impossible to commit

this crime . . ." (<u>Id.</u> at pp. 59–60.)  The Court made clear that counsel "[could not] argue that the document itself made it factually impossible or impossible to commit the crime." (<u>Id.</u>)  Upon a request for clarification from the Government, the Court explained, that Defendant's counsel can "put up the PIA, termination date, say, this is the contract; this was in force the whole time; here's what the contract permits.  He can do that.  Okay?  That's what he's asking to do.  He can do that." (<u>Id.</u> at p. 61.)  The Court then continued,

> [T]he [G]overnment's made a lot of arguments from the document and what its terms are and what it means and what you can and can't do under the document, so [Defendant] can make those same arguments what you can and can't do under the document.  The motion was to preclude him from going the next step to say, so it would have been impossible for them to commit this crime because, you know, what was alleged has been authorized by the document.  That's the next step that I've ruled upon.  Okay.  It's the impossibility to commit the crime.  He can't do that.

(<u>Id.</u>)  The Court reiterated that it only "precluded the defendant from making the legal impossibility defense before the jury, that is, that the agreement made it impossible for the crime to be committed. . . .  No more, no less." (<u>Id.</u> at p. 64.)  Following the Government's closing, Defendant requested that the Court revisit its prior ruling based on the Government's arguments.  Defendant's counsel stated, "I would like to go further and say, these individuals were authorized to have these documents, and I think that's a direct response to what the government just said." (<u>Id.</u> at p. 121.)  After taking counsel's request under advisement, the Court ruled,

> The defendant can argue in closing that he believes the PIA authorized defendant and his alleged co-conspirators to access the documents.  Counsel can argue that.  That is a collateral fact that is arguably relevant to the issue of the alleged conspirators' *mens rea*.  Particularly given [Government] counsel's statement in the first part of the closing argument that it is up to the jury to determin[e] authorization, that would be relevant.  It would be relevant evidence on the issues that are in the case.
> However, as my earlier rulings indicate, while actual authorization is relevant to the case, it is not determinative to the charges at hand.  Therefore, defense counsel may not argue to the jury that if the jury finds that the PIA authorized the members of APAC to access the documents, then the jury must find the defendant not guilty, or

any similar argument.  For instance, counsel cannot say, members of the jury, you must find the defendant not guilty because everything they did was authorized by the PIA.

(Id. at p. 128.)

At the conclusion of trial, the jury found Defendant guilty of the sole count against him and that Defendant conspired to violate 18 U.S.C. § 1832(a)(2) & (3) in two ways.  (Doc. 124.) Defendant filed a timely Motion for New Trial, (doc. 125), which he later supplemented with record citations, (doc. 140).  The Government responded in opposition, (doc. 141), and Defendant replied, (doc. 142).

## DISCUSSION

Before turning to Defendant's substantive contentions, the Court first addresses three procedural matters.

First, Defendant's record citations remain deficient.  For instance, Defendant contends that he elicited testimony on several issues from Gulfstream's witnesses.  (Doc. 140, p. 10.)  Yet, Defendant provides no citation for this purported testimony.  (Id.)  Despite making factual assertions and referencing trial proceedings throughout his brief, Defendant only cites to the record on two pages.  (Id. at pp. 11, 12.)  This deficiency provides a sufficient and independent basis for denying Defendant's Motion.  L. Cr. R. 12.1 ("Every factual assertion in a motion, response, or brief shall be supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence filed with the motion.").

Second, Defendant argues for the first time in his Reply that his impossibility defense was relevant to his *mens rea*.  (Doc. 142, pp. 2–3.)  He contends that legal impossibility would have buttressed the reasonableness of his belief that he was authorized to possess and use Gulfstream's trade secrets.  (Id.)  This argument strays from—and, in many ways contradicts—Defendant's prior

arguments. In his brief in support of his Motion for New Trial, Defendant distinguished his impossibility and *mens rea* arguments:

> The point here, to put it as succinctly as possible, is that Mr. Martinez had two separate defense theories: (1) lack of mens rea (no intent to steal because of a reasonable belief in a collaboration between the companies); and (2) the PIA making the planned 'crime' legally impossible. **These were separate, independent defense theories**, and that defense strategy depended on setting the stage for both, so that the defense could argue in closing, 'Look, you should believe Mr. Martinez when he says he didn't intend or conspire to steal. But if you are persuaded by the Government on the willful blindness argument—you still should acquit, because of the PIA. The PIA made this 'crime' legally impossible even if they thought it was a crime.'

(Doc. 140, p. 17 (emphasis supplied); see also id. at p. 27 ("[U]nder the PIA, APAC and Mr. Martinez were allowed to have and use the documents at issue, *irrespective of anyone's mens rea*.") (emphasis in original).) The Court will not consider an argument raised for the first time in a reply brief. United States v. Evans, 473 F.3d 1115, 1120 (11th Cir. 2006). Even if Defendant had properly raised this line of reasoning, it is unavailing. Defendant fails to explain how his impossibility defense, premised on the assumption that he "intended to take the documents without authorization," (doc. 140, p. 18), could be relevant to his alternative defense that he *did not* intend to take documents without authorization. Moreover, the jury was required to assess Defendant's guilt "'according to the circumstances as he believe[d] them to be, rather than the circumstances as they may have existed in fact.'" Williams, 553 U.S. at 300 (quoting Model Penal Code § 5.01, note on attempt (Am. L. Inst. Proposed Official Draft 1985)). Defendant was not aware of the PIA, much less any impossibility flowing from the agreement. Thus, the purported impossibility could not have been probative of Defendant's state of mind.[3]

---

[3] Defendant's contention that the Court permitted the Government to argue from the PIA but prevented him from doing so wholly unavailing. The Court allowed Defendant to argue to the jury that the PIA authorized APAC to take, possess, and use the documents as a collateral matter relevant to his and his coconspirators' *mentes reae.* (Doc. 139, p. 138.) The Court only prevented him from "going the next step" by arguing that the PIA made it impossible for him to commit the crime of conspiracy. (Id. at p. 61.) The Court reiterated

On the third procedural matter, Defendant contends that the "[t]he Court explained that its order limiting defense counsel's argument was based on the Court's disagreement with the defense's interpretation of the PIA, and on the Court's prior ruling denying the defense's Rule 29 motion for a judgment of acquittal." (Doc. 140, p. 9.) He claims "[t]here is no authority, nor could there be, for the proposition that a criminal defendant who makes an argument in a Rule 29 motion is thereafter precluded from making that argument to the jury. Yet that is what happened in this case." (Id. at p. 21.) Defendant attributes the following statement to the Court, "'I disagree with your interpretation of the evidence; therefore I'm ordering you not to argue your interpretation of the evidence to the jury.'"[4] (Id. at p. 22.) These are grossly inaccurate representations of the proceeding and the Court's ruling. The Court heard oral argument from the parties on this issue, issued a lengthy ruling, answered counsel's questions seeking clarification, and revisited the ruling at Defendant's request. (Doc. 139, pp. 47–64, 128.) Nowhere in those proceedings did the Court state that it was disallowing the impossibility argument because of its ruling on the Rule 29 Motion.[5] Indeed, the Court specifically stated, "**putting the Rule 29 ruling aside**, what we have

---

that it only "precluded the defendant from making the legal impossibility defense before the jury, that is, that the agreement made it impossible for the crime to be committed. . . . No more, no less." (Id. at p. 64.)

[4] This is an apparent attempt to paraphrase and does not directly quote the Court's ruling (though it is hard to say, given Defendant's overall lack of record citations). Even a cursory reading of the record reveals that the Court made no statement to this effect. This is one of multiple misrepresentations in Defendant's brief. For instance, Defendant asserts, "[t]he Court stated that it had 'gone through all this on the Rule 29.'" (Doc. 140, p. 12.) However, the quoted excerpt was not a statement but a portion of a question that the Court posed to Defendant's counsel. (Doc. 139, p. 52 ("Didn't we go through all of this on the Rule 29? That it doesn't matter -- because I didn't just rule that there's evidence from which the jury could find they didn't have authorization.").) These misrepresentations are unfortunate given that defense counsel conducted themselves with forthrightness and professionalism throughout the trial.

[5] To be sure, the Court and parties referenced Defendant's Rule 29 Motion and the Court's ruling on that Motion during oral argument on the Government's Motion to preclude Defendant from offering the impossibility argument during closing. Also, the Court's ruling on the two motions included similar reasoning and precedential support. This is unsurprising given that both Motions revolved around the same question—whether the Government was required to prove that Defendant and his coconspirators did not have actual authority to possess the trade secrets—and the case law on that question did not change in the

here is the government now making a motion, saying, Judge, that argument would be improper, because it's an element we don't have to meet." (Id. at p. 56.)  Nor was the ruling based on the Court's disagreement with Defendant's interpretation of the PIA or any factual matter.  Rather, the Court explained at length that Defendant's argument was "an improper argument" under Supreme Court and Eleventh Circuit precedent as well as the agreed upon jury charges.  (Id. at pp. 55–59.)  Nowhere in the Court's ruling did it express any "disagreement with the defense's interpretation of the PIA" or any other piece of evidence.  In sum, the Court flatly denies Defendant's claim that "it was error for the Court to rely on its prior denial of the defense's Rule 29 motion as a basis for its order prohibiting defense counsel from making the impossibility argument," (doc. 140, p. 21), because the Court's ruling contained no such reliance.

Putting these procedural issues aside, Defendant's Motion for New Trial rests on a singular substantive contention: that the Court prevented his counsel from making a legal impossibility argument during closing.  (Id. at p. 8.)  He contends that his attorney would have told the jury,

> '*Because* of the contract, this *could not* have been a crime; it was *impossible* for this to be a crime because APAC and Martinez's possession of the documents was lawful; therefore the Government cannot satisfy the element of the offense on Page 2 of your jury instructions, that the act agreed to must constitute a separate federal crime.  Here the act agreed to—even if it was to obtain these documents without Gulfstream's permission—could not have been a crime, because legally they were allowed to have them under the contract.'

(Id.)  He argues that his reasoning sounds in legal impossibility and that "[l]egal impossibility is a defense to conspiracy; factual impossibility is not."  (Id. at p. 14 (citing United States v. Oviedo, 525 F.2d 881, 883 (5th Cir. 1976).)

The Court correctly prohibited Defendant from making this argument to the jury.  The argument was not legally tenable for a host of reasons set forth in detail below.  Moreover, even if

---

twenty-six hours between the Court's rulings.  However, the Court did not reflexively grant the Government's Motion to limit closing because it had denied Defendant's Rule 29 Motion.

Defendant had asserted a viable legal impossibility defense, that would be an issue of law for the Court to decide and not a proper matter for the jury.  Lastly, even assuming Defendant clears those barriers, there was no evidence to support his impossibility argument.

## I.    The Court's Discretion to Limit Closing Argument

The Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quotations omitted).  Defense counsel's final argument is "the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." Herring v. New York, 422 U.S. 853, 862 (1975). Consequently, "closing argument is a 'critical stage' of a trial, and . . . a court's complete denial of an opportunity for closing argument by defense counsel constitutes the denial of counsel at a critical stage and warrants reversal without a specific showing of prejudice." Hunter v. Moore, 304 F.3d 1066, 1070 (11th Cir. 2002).  However, "[t]his guarantee does not mean that a defendant can make any argument he desires." United States v. Harris, 916 F.3d 948, 959 (11th Cir. 2019). "[C]losing arguments in a criminal case [need not be] uncontrolled or even unrestrained." Herring, 422 U.S. at 862.  A trial judge "must be and is given great latitude in . . . limiting the scope of closing summations." Id.  The court "may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." Id.

"Absent a showing of an abuse of discretion the district court will not be reversed for limiting summation as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case." United States v. Gaines, 690 F.2d 849, 858 (11th Cir. 1982) (internal citations omitted) (citing United States v. Newman, 628 F.2d 362, 365-66 (5th Cir. 1980); United States v. Scales, 599 F.2d 78, 80–81 (5th Cir. 1979); United States v. Smith, 433 F.2d 1266, 1272 (5th Cir. 1970)).  "In arguing the law to the jury, counsel is confined

to principles that will later be incorporated and charged to the jury." United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983) (citing United States v. Sawyer, 443 F.2d 712, 714 & n. 11 (D.C. Cir. 1971)).  "Defense counsel may not argue incorrect or inapplicable theories of law to a jury." United States v. Valdes-Guerra, 758 F.2d 1411, 1416 (11th Cir. 1985) (rejecting contention that defendant should have been allowed to argue that government must prove separate illegal act to support conviction for conspiracy to violate currency reporting provisions).  Thus, the Court does not abuse its discretion when it prevents counsel from presenting an invalid defense to the jury. See, United States v. Marrero, 219 F. App'x 892, 898 (11th Cir. 2007).  Nor does the Court abuse its discretion when it precludes a jury argument that is not supported by the evidence.  See United States v. Rolon, 445 F. App'x 314, 325 (11th Cir. 2011).

## II.     An Overview of Impossibility Defenses

Prior to delving into the substance of Defendant's argument, the Court reviews the doctrines underlying his contentions: legal impossibility and factual impossibility.

### A.     Legal Impossibility

Legal impossibility is not the respected rescuer of conspirators that Defendant portrays. Quite the contrary, "[t]aken as a whole, the cases involving the defense of impossibility reveal a definite trend toward restricting or eliminating the defense."  Jeffrey F. Ghent, Annotation, *Impossibility of Consummation of Substantive Crime as Defense in Criminal Prosecution for Conspiracy or Attempt to Commit Crime*, 37 A.L.R. 3d 375 § 2 (1971). Courts have long recognized that "the doctrine of impossibility ha[s] become mired in fine distinctions and ha[s] lost whatever acceptance at common law it may have possessed . . . ." United States v. Everett, 700 F.2d 900, 905 (3d Cir. 1983).  Attempts to apply the doctrine have created a "morass of confusion" and have been "a source of utter frustration for the courts, text writers and law

professors," <u>United States v. Thomas</u>, 13 U.S.C.M.A. 278, 286–87 (1962).  "As a result, the great majority of jurisdictions have now recognized that legal and factual impossibility are logically indistinguishable, and have abolished impossibility as a defense."  <u>United States v. Hsu</u>, 155 F.3d 189, 199 (3d Cir. 1998) (citing <u>United States v. Quijada</u>, 588 F.2d 1253, 1255 (9th Cir. 1978); <u>United States v. Darnell</u>, 545 F.2d 595, 597 (8th Cir. 1976); <u>United States v. Duran</u>, 884 F. Supp. 577, 580 n. 5 (D.D.C. 1995)).

The denigration of legal impossibility is particularly true as to charges of conspiracy. "While a charge that a crime has been attempted or committed focuses on the defendant's *conduct* leading toward the commission of the crime, a charge of conspiracy is concerned more with the *intent* of the alleged perpetrators."  <u>United States v. Petit</u>, 841 F.2d 1546, 1550 (11th Cir. 1988) (emphases in original).  "That a factor unknown to the conspirators makes it impossible for them to complete their intended crime in no way lessens the degree of culpability involved in the criminal combination."  <u>State v. Moretti</u>, 244 A.2d 499, 502 (N.J. 1968).[6]  Consequently, "the impossibility that the defendants' conduct will result in the consummation of the contemplated crime is not as pertinent in a conspiracy case as it might be in an attempt prosecution."  <u>Id.</u>; <u>see also</u> <u>United States v. Jimenez Recio</u>, 537 U.S. 270, 274 (2003) (overturning holding that criminal conspiracy terminates once conspiracy's goals become impossible to achieve); <u>Beddow v. United States</u>, 70 F.2d 674, 676 (8th Cir. 1934) ("Neither the success nor the failure of criminal conspiracies is determinative of the guilt or innocence of the conspirators.")).  Some courts have gone as far to say "[w]here, as here, an indictment alleges conspiracy, legal impossibility affords a conspirator no defense."  <u>United States v. Trapilo</u>, 130 F.3d 547, 552 n. 9 (2d Cir. 1997) (citing <u>United States v. Feola</u>, 420 U.S. 671, 693 (1975)).

---

[6] The Eleventh Circuit cited <u>Moretti</u> favorably in <u>Petit</u>, 841 F.2d at 1550.

Even courts that recognize a legal impossibility defense often limit the application to "pure legal impossibility."  For instance, in United States v. Fernandez, 722 F.3d 1 (1st Cir. 2013), the United States Court of Appeals for the First Circuit recognized that "'legal impossibility' is often an ineffective defense in a conspiracy case because a conspiracy charge does not require a completed crime," id. at 31.  However, the court found the defendant's argument to be one of "a more potent form of the doctrine," that being "'pure legal impossibility,' which arises when no statute 'proscribe[s] the result that the defendant expected, desired, and intended to achieve.'" Id. (citing Ira P. Robbins, *Attempting the Impossible: the Emerging Consensus*, 23 Harv. J. on Legis. 377, 390 (1986)).  The First Circuit found that "[p]ure legal impossibility is always a defense." Id. (quoting Hsu, 155 F.3d at 199 n. 16).[7]  However, the court distinguished "pure legal impossibility" from the unavailing defense of "'mixed fact/law impossibility' . . . [which] involve[s] a factual mistake relating to a legal determination." Id. (quoting Robbins, *supra* at 394).

Given the antipathy towards legal impossibility, it is unsurprising that Defendant has not presented any binding authority establishing the theory as a viable defense to a conspiracy charge. He maintains that "the governing law of this Circuit" establishes that "[l]egal impossibility is a defense to conspiracy."  (Doc. 140, p. 14 (citing Oviedo, 525 F.2d at 883).)[8]  He doubles down on this claim in his Reply and claims that binding precedent "establishes that while factual

---

[7] Even "pure" legal impossibility is of questionable viability.  In Fernandez, the First Circuit quoted the Third Circuit's discussion, in Hsu, of attempt, not conspiracy.  See Fernandez, 722 F.3d at 31 (quoting and citing Hsu, 155 F.3d at 199).  When discussing conspiracy, the Third Circuit, in Hsu, held, "[a]lthough we have stated that impossibility may be a valid defense to attempt crimes, we have never recognized the defense for conspiracy charges, and we are persuaded by the views of our district courts, and by the decisions of our sister circuits, that the impossibility of achieving the goal of a conspiracy is irrelevant to the crime itself."  155 F.3d at 203 (internal citations omitted) (citing United States v. Wallach, 935 F.2d 445, 470 (2d Cir. 1991); United States v. LaBudda, 882 F.2d 244, 248 (7th Cir. 1989); Petit, 841 F.2d at 1550; United States v. Everett, 692 F.2d 596, 599 (9th Cir. 1982); Yepes v. United States, No. 93–2310, 1993 WL 525578, at *4 (D.N.J. Dec. 15, 1993)).

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

impossibility is not a defense to conspiracy, legal impossibility is.  Oviedo says this expressly." (Doc. 142, p. 5.)  Defendant is mistaken.

First, Oviedo involved charges of criminal attempt, not conspiracy.  As one commentator has suggested, "[a]ttorneys trying conspiracy cases should avoid falling into the trap of arguing . . ., for purposes of the defense of impossibility, a conspiracy charge was the same as a charge of attempting to commit a crime."  Ghent, *supra*, § 2(b) (citing Moretti, 244 A.2d at 502).  "It seems that such an equation could not be sustained . . . because . . . a conspiracy charge focuses primarily on the [i]ntent of the defendants, while in an attempt case the primary inquiry centers on the defendants' [c]onduct tending toward the commission of the substantive crime."  Moretti, 244 A.2d at 502; see also, Wayne R. LaFave, *Impossibility*, 2 Subst. Crim. L. § 12.4(a) (2023) ("Courts have generally taken a broader view of the purposes of the law of conspiracy. . . . It is not surprising, therefore, that courts have not been as receptive to the impossibility defense when the charge is conspiracy rather than attempt.").

Moreover, in Oviedo, rather than establishing legal impossibility as the "governing law of this Circuit," the court criticized the doctrine and declined to apply it.  To be sure, the court in Oviedo explained that "[t]he traditional analysis recognizes legal impossibility as a valid defense, but refuses to so recognize factual impossibility." 525 F.2d at 883 (citing United States v. Berrigan, 482 F.2d 171 (3rd Cir. 1973)).  However, the court found this approach "not particularly helpful" and noted that "[a]t least one writer has recognized that legal impossibility is logically indistinguishable from factual impossibility."  Id. at 883 n. 5 (citing Jerome Hall, *Criminal Attempt-A Study of Foundations of Criminal Liability*, 49 Yale L.J. 789, 836 (1940)).  Thus, rather than drawing distinctions between legal and factual impossibility, the court focused on the "objective acts of the defendant."  Id. at 885.  Courts have recognized Oviedo as a derogation, not

an endorsement, of the legal impossibility doctrine.  See, e.g., United States v. Root, 296 F.3d 1222, 1230 n. 14 (11th Cir. 2002) (superseded by statute on other grounds); United States v. Powell, 1 F. Supp. 2d 1419, 1421 (N.D. Ala. 1998) ("In the Eleventh Circuit, however, traditional factual impossibility/legal impossibility analysis has been discarded in favor of an inquiry which focuses on the 'objective acts' of the defendant.") (citing Oviedo, 525 F.2d at 885).  Given this recognition, it is confounding for Defendant to continually cite Oviedo as the precedential basis for his impossibility defense.

The only binding authority cited by Defendant which arguably relies on the doctrine of legal impossibility is United States v. McInnis, 601 F.2d 1319 (5th Cir. 1979).  The defendants there were charged with conspiring to violate the federal antikidnapping statute, 18 U.S.C. § 1201. Id. at 1321.  The alleged coconspirators schemed to entice the victim to travel into Mexico so that he could be kidnaped there.  Id.  However, they "planned neither to cross state or international borders themselves nor to follow the abduction of [the victim] with international travel."  Id. at 1326.  Thus, the former Fifth Circuit concluded that even if the coconspirators had carried out their scheme exactly as planned, their conduct would not have been proscribed by the federal kidnapping statute.  Id. at 1324–27.  Thus, "[t]he district court correctly concluded that the indictment should be dismissed because the conduct alleged was not what Congress forbade by the statute."  Id. at 1327.  However, the Fifth Circuit has questioned whether McInnis relied upon the doctrine of legal impossibility.  See United States v. Farner, 251 F.3d 510, 513 n. 3 (5th Cir. 2001).  In Farner, the court acknowledged that the district court in McInnis cited legal impossibility but pointed out that the appellate court "then analyzed the federal statute and affirmed the dismissal, but did not apply the label of 'legal impossibility' or any other label to its analysis."  Id. The Farner court concluded, "[a]nother label that could describe the McInnis result is the 'principle

22

of legality.'" Id. (citing United States v. Lanier, 520 U.S. 259, 266 n. 5 (1997); Berrigan, 482 F.2d at 186).

So, what can be said of the defense of legal impossibility?  Is it relegated to the scrap heap of rejected common law theories?  Is it entirely inapplicable in all conspiracy cases? Perhaps.[9] However, to resolve this case, the Court, like the Fifth Circuit in Farner, "need not hold that there can never be a case of true legal impossibility."  251 F.3d at 513.[10]  Yet, the Court must be mindful that, particularly as to charges of conspiracy, "such a case would be rare."  Id.  At most, legal impossibility provides a defense when "no statute 'proscribe[s] the result that the defendant expected, desired, and intended to achieve.'"  Fernandez, 722 F.3d at 31 (quoting Robbins, *supra* at 390).

### B.    Factual Impossibility

While courts are reticent to accept any legitimate application of legal impossibility, they are quick to reject defenses as improper arguments of factual impossibility.  The United States Supreme Court has made clear that for inchoate crimes like conspiracy, "impossibility of completing the crime because the facts were not as the defendant believed is not a defense." Williams, 553 U.S. at 300; see also United States v. Jones, 765 F.2d 996, 1001–02 (11th Cir. 1985)

---

[9] The Government makes a compelling case that impossibility, whether legal or factual, is no defense to a conspiracy charge and that courts should address such arguments by "simply examining whether the evidence presented proved the elements of the charged offense."  (Doc. 141, p. 9.)  Courts have read the Eleventh Circuit's opinions to imply just that.  See Hsu, 155 F.3d at 203; see also, LaFave, *supra* § 12.4(a) ("conspiracy cases have usually gone the simple route of holding that impossibility of any kind is not a defense.").  However, to the Court's knowledge, neither the Eleventh Circuit nor the Supreme Court has directly stated that legal impossibility can never be a defense to a conspiracy charge.

[10] See also United States v. Yang, 281 F.3d 534, 543 (6th Cir. 2002) ("It is not necessary for us to delve into the question of whether a defense of legal impossibility is recognized at all in the Sixth Circuit, and indeed, we are aware of a handful of cases over the past decade in which we have at least acknowledged the possibility that there is such a defense.") (citing United States v. Mise, 240 F.3d 527, 530 (6th Cir. 2001); United States v. Hixon, 987 F.2d 1261, 1267 (6th Cir. 1993); United States v. Peete, 919 F.2d 1168, 1175–76 (6th Cir. 1990)).

("[N]ot only [may] a plan . . . be pretty half-baked and still be a criminal conspiracy if the intentions of the participants are illicit, but also . . . sheer impossibility is no defense.") (discussing United States v. Elledge, 723 F.2d 864 (11th Cir. 1984)).

Even in instances where an impossibility defense centers on the legal status of some factor relevant to the charge against a defendant, courts consistently rebuff the defense.[11]  For instance, in United States v. Holmes, 767 F.2d at 824, the defendant argued that it was impossible for her to conspire and attempt to extort a business entity in violation of the Hobbs Act.  She claimed that she could not have caused economic harm as required by the statute because the intended victim was a fictitious business entity represented by an undercover FBI agent.  Id. at 824.  The Eleventh Circuit flatly discarded this argument.  Id.  Likewise, courts have precluded alleged narcotics conspirators from arguing that various legal elements cannot be met because the drugs they agreed to traffic did not exist or were counterfeit.  See, e.g., United States v. Taylor, 480 F.3d 1025, 1027 (11th Cir. 2007) (interstate nexus satisfied when defendant conspired to rob stash house of fictional narcotics organization); Daniels v. United States, No. 8:08-CV-813-T-30MAP, 2009 WL 1513385, at *3 (M.D. Fla. May 27, 2009) (defendant's "contention that drugs never existed . . . is irrelevant" because "[a]ll that is necessary for a charge of conspiracy is that there was an agreement to achieve an unlawful objective, knowing and voluntary participation, and an overt act in furtherance of the conspiracy") (citing United States v. Hansen, 262 F.3d 1217, 1246 (11th Cir. 2001)); see also

_____

[11] Some courts refer to these arguments as "hybrid legal impossibility."  See, e.g., Hix v. Commonwealth, 619 S.E.2d 80, 84 n. 5 (Va. 2005) ("[The defendant] urges this Court to adopt a third kind of impossibility defense: 'hybrid legal impossibility.'  Under this theory, a mistake of fact about the legal status of some necessary element of the crime nullifies a crime of attempt.  In accordance with the large majority of jurisdictions, we decline to adopt this position.") (citing Farner, 251 F.3d at 513; United States v. Darnell, 545 F.2d 595, 598 (8th Cir.1976); People v. Rojas, 358 P.2d 921, 923–24 (Cal. 1961); Moretti, 244 A.2d at 503).

<u>Farner</u>, 251 F.3d at 511–12 (denying defendant's claim that it was legally impossible for him to attempt to persuade and entice minor to engage in criminal sexual activity because person he traveled to meet was law enforcement agent).  Thus, simply couching arguments in terms of legal consequences will not save an impossibility defense from being recognized as an improper factual impossibility argument.

## III.    Defendant's Impossibility Argument is Legally Untenable.

Turning to Defendant's argument, he contends that, unbeknownst to him, through the PIA, Gulfstream authorized APAC to take, possess, and use Gulfstream's trade secrets.[12]  (Doc. 140, pp. 14–22.)  He reasons that this authorization made it impossible for him to commit the substantive offense of converting the trade secrets and, as such, he could not be convicted of conspiring to commit that substantive offense.  (<u>Id.</u>)  Thus, he maintains that his attorney should have been allowed to tell the jury that "it could acquit Mr. Martinez *even if* it believed that Mr. Martinez intended to take the documents without authorization . . . ."  (<u>Id.</u> at p. 18.)

Defendant's impossibility argument is legally untenable for multiple independent reasons.  First, while Defendant attempts to shoehorn this argument into the narrow definition of legal impossibility, it is one of factual impossibility.  Second, putting labels aside, his argument bears all the hallmarks of defenses that the Eleventh Circuit has disallowed.  Third, Defendant's impossibility argument contradicts the agreed upon jury charges.  Fourth, legal impossibility is not a valid defense to a conspiracy to violate the EEA.  For all these reasons explained fully below, Defendant's impossibility argument was an "incorrect or inapplicable theor[y] of law," and the Court was correct to preclude it.  <u>Valdes-Guerra</u>, 758 F.2d at 1416.

---

[12] As explained in Section IV below, the undisputed evidence does not support Defendant's argument factually.  However, for the purposes of the discussion in this Section, the Court assumes, *arguendo*, that the PIA provided the broad authorization Defendant contends.

A.      **The Court Properly Disallowed Defendant's Argument as one of Factual Impossibility.**

Defendant concedes, as he must, that he could not make a factual impossibility argument to the jury.  (Doc. 140, p. 14.)  However, he then unsuccessfully strains to distinguish his argument from those that have been rejected by courts as factual impossibility arguments.  As noted above, drawing distinctions between types of impossibility can be difficult and, in some cases, pointless.  Nonetheless, even accepting Defendant's invitation to step into the "morass of confusion" of impossibility categorization, Thomas, 13 U.S.C.M.A. at 286, his argument sounds in factual impossibility.

In essence, Defendant argues that he and the other members of the APAC team could not have conspired to convert Gulfstream's trade secrets because Gulfstream permitted APAC to take, possess, and use them.  Whether one company has allowed another company to have and use their information is a matter of fact and circumstances, not a matter of statutory proscription.  Defendant acknowledged as much in his Brief in Support of his Rule 29 Motion in which he stated, "[a]uthorization is an objective element; **it's a fact about the world**, referring to the actions of the owner of the trade secret . . . ."  (Doc. 106, p. 3.)  Thus, Defendant does not argue that no statute "proscribes the result that [he] expected, desired, and intended to achieve'" as required for a cognizable legal impossibility defense.  Fernandez, 722 F.3d at 31 (quoting Robbins, *supra* at 390).  To the contrary, Defendant wanted to tell the jury that it could acquit him even if he expected, desired, and intended to "obtain and use the documents without Gulfstream's permission."  (Doc. 140, p. 11.)  This result—obtaining and using another's trade secrets without authorization—is unquestionably proscribed by the EEA.  18 U.S.C. § 1832(a).

At its core, Defendant's theory is that, regardless of his intent, he could not have completed the crime because the facts and circumstances—those being that Gulfstream had entered into the

PIA with APAC and permitted APAC to take, possess, and use Gulfstream's documents—were not as he believed them to be.  This is the epitome of an improper factual impossibility defense. Williams, 553 U.S. at 300.  To determine Defendant's guilt as to conspiracy, the jury was required to assess his conduct "according to the circumstances as he believe[d] them to be"—those being that there was no agreement between APAC and Gulfstream and Gulfstream had not permitted APAC to take, possess, and use Gulfstream's trade secrets—"rather than the circumstances as they may have existed in fact." Id. (quoting ALI, Model Penal Code, *supra* § 5.01, cmt. 3).

To equate his defense to one of legal impossibility, Defendant attempts to equate the scope of the PIA with the scope of a criminal statute.  He contends that he should have been allowed to argue in closing that "[t]he PIA made this 'crime' legally impossible even if [Defendant and his alleged coconspirators] thought it was a crime."  (Doc. 140, p. 17; see also id. ("The argument is the same whether it is a statute, case, regulation, or contract that determines the legal status of a wetland, a gun, or a document.").)  However, Defendant does not cite any case equating a contract to a statute or even a case where a court implied that a contract could form the basis for a valid legal impossibility defense.  Moreover, the PIA was simply a memorialization of fact and circumstances—or in Defendant's words, "a fact about the world," (doc. 106, p. 3)—reducing to writing two parties' promises to one another.  Thus, Defendant does not convert the essence of his argument from factual impossibility to legal impossibility simply by citing a contract.

Nor does Defendant escape the prohibition against factual impossibility by citing the legal ramifications flowing from the PIA.  He argues that "[t]he PIA had its effects as a matter of law in defining the status of the documents."  (Doc. 140, p. 28.)  At best, this is a contention that the legal status of some factor relevant to his conduct rendered the crime impossible.  As explained above, courts have consistently rejected such arguments of "hybrid legal impossibility."  Hix, 619 S.E.2d

at 84 n. 5;  Holmes, 767 F.2d at 824; see also Beddow, 70 F.2d at 676 (affirming conviction for conspiracy to obtain money from the United States by forging and uttering indorsements on bonds, even though legally deficient witnessing of bonds prevented completion of crime); United States v. Sutley, Crim. No. 05-00345-KD-C, 2007 WL 329148, at *6 (S.D. Ala. Feb. 2, 2007) (denying defendant's claim that it was impossible for him to conspire to transfer funds to avoid seizure because statute requires there be person who is authorized to make seizure and no such person actually existed);  United States v. White, 597 F. Supp. 2d 1269, 1271 (M.D. Ala. 2009) ("[T]he government may obtain a valid conviction if it proves that the defendant intended to defraud a bank that he believed was federally insured, even if it was not.").

For all these reasons, Defendant's argument is not one of legal impossibility.  Rather, it posits a legally untenable factual impossibility defense.

B.      Defendant's Argument is Improper by any Label.

Putting nomenclature aside, Defendant's argument is directly analogous to defenses that the Eleventh Circuit and other courts have consistently rejected.

In Petit, the defendants were charged with and convicted of conspiring to receive and possess stolen goods as the result of a sting operation conducted with the permission of a carrier of electronic equipment.  841 F.2d at 1548.  The defense argued that because the electronic equipment was not actually stolen, "but rather had been borrowed by the government with the carrier's permission," the defendants could not have been convicted of the substantive offense of possessing stolen merchandise.  Id. at 1549. Thus, the defendants contended, because the legal status of the goods made it impossible for them to commit the substantive offense, "they should not have been convicted of conspiring to commit [that] offense."  Id.  The Eleventh Circuit rejected the defendants' impossibility argument, holding that "a charge of conspiracy is concerned more

with the intent of the alleged perpetrators," and "it is unnecessary that the substantive crime itself be committed."  Id. at 1550.  Thus, "the government did not have to prove that the items were *actually* stolen; it was enough for the government to show that the conspirators conspired to receive goods which they *believed* to be stolen."  Id. (quoting United States v. Sarro, 742 F.2d 1286, 1297 (11th Cir. 1984)) (alterations omitted).

Likewise, in this case, to prove that Defendant conspired to possess or use Gulfstream's trade secrets without authorization, the Government did not have to prove that the trade secrets were *actually* unauthorized, but only that Defendant *believed* them to be unauthorized.  Just as the carrier's authorization as to the electronic equipment in Petit did not negate the conspirators' criminal liability, Gulfstream's authorization as to the trade secrets in this case did not negate Defendant and his coconspirators' liability.  Instead, it is "the *intent* of the alleged perpetrators" that matters.  Id. at 1550.  Here, the intent presumed by Defendant's impossibility argument was that he and his coconspirators intended "to obtain and use these documents without Gulfstream's permission."  (Doc. 140, p. 11.)  This intent was unquestionably unlawful, and it would have been legally untenable for him to tell the jury otherwise.

Defendant seeks to distinguish Petit by arguing,

> [t]he critical distinction between this case and Petit is that in Petit, if the defendants had in fact carried out their plan, it would have been a crime.  They were not legally entitled to the goods, and so if they had gotten them, it would have been a crime. But they were never going to actually get them because the whole thing was a sting operation.

(Id. at p. 28 (emphases omitted).)  Defendant misrepresents the facts and holding of Petit.  The circumstance underlying the defendants' impossibility argument in that case was not that they were "never going to actually get [the goods]" as Defendant contends.  In fact, the Petit defendants "got the goods."  See Petit, 841 F.2d at 1548–49 (explaining that tractor-trailer full of electronic

equipment arrived at one defendant's place of business and defendants began unloading equipment into business located in small warehouse where another defendant worked and undercover agent "ordered the unloading to stop" until defendants showed they had money for merchandise). Further, Petit makes clear that the circumstance underlying the defendants' proposed impossibility argument was the actual status of the goods—that being that the goods were not actually stolen. Id. at 1549–50.  Thus, the impossibility argument the Eleventh Circuit rejected in Petit mirrors Defendant's argument in this case.  Defendant fails to address, much less explain, why the actual—as opposed to perceived—status of the trade secrets would be probative in this case when the actual legal status of the electronic equipment did not matter in Petit.

Moreover, it is mystifying for Defendant to argue that the "critical distinction between this case and Petit is that in Petit, if the defendants had in fact carried out their plan, it *would* have been a crime." (Doc. 140, p. 128.)  The Eleventh Circuit made clear that defendants in Petit "*could not have been convicted* of the substantive offense of receiving stolen property."  841 F.2d at 1551 (emphasis supplied).  Nonetheless, the defendants' "convictions for conspiring to receive stolen property cannot be reversed on this ground."  Id.  Put another way, it did not matter whether the Petit defendants could not have committed the substantive offense due to the status of the items they possessed and received; they still could be convicted of conspiring to commit that offense. Likewise, it did not matter whether Defendant could not have committed the substantive offense of converting trade secrets due to the status of the items he possessed and received; he still could be convicted for conspiring to commit that offense.  Thus, Defendant's attempt to distinguish this case from Petit only highlights the shortcomings of his impossibility argument.

Petit is not an outlier.  Time and again, courts have rebuffed arguments like those Defendant sought to present to the jury.  For instance, in United States v. Booty, 621 F.2d 1291 (5th Cir. 1980),

the defendant was charged with conspiracy to defraud the United States Small Business Administration ("SBA") in violation of 18 U.S.C. § 371. The defendant and his business partner obtained loans from the SBA in exchange for their promises to assign their interest in life insurance policies to the administering banks, but they never actually assigned the banks or the SBA any interest in the policies. 621 F.2d at 1293–96. After he defaulted on the loan and his partner died, the defendant received life insurance proceeds which he concealed from the SBA. Id. When he was eventually indicted for defrauding the SBA of the loan proceeds, the defendant argued that "it would have been impossible for him to defraud the SBA because the SBA had no legal right to the insurance proceeds." Id. at 1297. The former Fifth Circuit held that "[e]ven assuming that this is what the evidence shows, the argument misses the point." Id.

> Possibility of success is not a requisite element of a criminal conspiracy under 18 U.S.C. § 371. All the statute requires is that two or more persons conspire to commit an offense against or otherwise defraud the United States and that one or more of such persons do an act in pursuit of that objective. Here there was sufficient evidence from which to conclude, as the government contended, that [the defendant] and [his partner] believed that the SBA had a valid claim to the insurance proceeds, and that as a result of this belief they conspired and acted to conceal the proceeds from the SBA. This was sufficient to establish a violation of the statute.

Id. at 1297–98 (citations omitted). Like the defendant in Booty, Defendant claims he could not, as a matter of law, conspire to convert something he was legally authorized to have. However, he, like the defendant in Booty, "misses the point," id. at 1297. Whether the PIA authorized Defendant to take, possess, and use Gulfstream's trade secrets is not the issue. Rather, the Government was only required to prove that Defendant Martinez and his coconspirators "believed that [they] had [no] valid claim" to the trade secrets, and that "as a result of this belief they conspired and acted" to convert them. Id. at 1298.

Regardless of the label assigned to Defendant's argument, it was legally untenable under binding precedent, and the Court was correct to keep it from the jury.

C.       Impossibility is not a Defense to a Trade Secret Conspiracy.

Defendant fares particularly poorly when attempting to assert impossibility defenses as a shield to allegations that he attempted or conspired to convert trade secrets.  Defendant has not cited a single case where a defendant accused of a trade secret crime successfully asserted an impossibility defense.  In contrast, the Government has cited a litany of federal cases holding that impossibility, legal or factual, is no defense to a violation of the EEA.

In Hsu, the defendants faced charges of attempting and conspiring to steal trade secrets, and they sought to examine the documents underlying those charges.  155 F.3d at 199.  They claimed they needed to review the documents to determine whether they contained trade secrets because it would have been legally impossible for them to conspire to convert trade secrets if the documents contained no such information.  Id.  The United States Court of Appeals for the Third Circuit disagreed and found that impossibility is not a viable defense to a charge of attempted theft of trade secrets or to conspiracy to steal trade secrets.  Id. at 203.  The court conducted an extensive analysis of the EEA including the comprehensive nature of the statute's approach to corporate espionage and the fact that the law was drafted at a time when the defense of legal impossibility had been almost entirely abandoned.[13]   Id. at 200–02.   The court also observed that if legal impossibility were a defense, agents would be compelled to use actual trade secrets in sting operations and would be compelled to turn over those trade secrets to persons charged with

_____

[13]  Pertinently, the "[t]he House [of Representatives] . . . explained [in a report] that the EEA was crafted to punish virtually every form of illegal industrial espionage, 'from the foreign government that uses its classic espionage apparatus to spy on a company, to the two American companies that are attempting to uncover each other's bid proposals, or to *the disgruntled former employee who walks out of his former company with a computer diskette full of engineering schematics*.'"  Hsu, 155 F.3d at 201 (quoting H.R.Rep. No. 104–788, at 5, 1996 U.S.C.C.A.N. at 4024) (emphasis supplied).

attempting to steal them. [14] <u>Id.</u>  The Third Circuit held that the basis of the conspiracy charge is the agreement to commit the unlawful act, and not the unlawful act itself.  <u>Id.</u> at 203.  Because the "illegality of the agreement does not depend on the achievement of its ends," and because it is "irrelevant that the ends of the conspiracy were from the very inception of the agreement objectively unattainable," it is also irrelevant that it may have been objectively impossible for the conspirators to commit the substantive offense.  <u>Id.</u> at 203 (quoting <u>United States v. Jannotti</u>, 673 F.2d 578, 591 (3d Cir. 1982)).

It appears that every other court to address the question has also held that legal impossibility is not a valid defense to charges of attempting or conspiring to steal trade secrets. <u>See</u> <u>United States v. Shi</u>, 991 F.3d 198, 210 (D.C. Cir. 2021) ("Because [the defendant] has not raised the issue, we assume without deciding that the defendant's belief, not the actual status of targeted information, is the correct standard.  This understanding best comports with our precedent holding that impossibility is not a defense to an inchoate crime, as well as the intent behind 18 U.S.C. § 1832, the statute defining the crime of conspiracy to commit theft of trade secrets."); <u>United States v. Nosal</u>, 844 F.3d 1024, 1044–45 (9th Cir. 2016) (finding no error in jury charge that government need not prove the existence of actual trade secrets because "a conviction may be upheld even where the object of the crime was not a legal possibility"); <u>United States v. Wen Chyu Liu</u>, 716 F.3d 159, 170 (5th Cir. 2013) ("the relevant inquiry in a conspiracy case, such as this one, is whether the defendant entered into an agreement to steal, copy, or receive information that he *believed* to be a trade secret"); <u>United States v. Yang</u>, 281 F.3d 534, 544 (6th Cir. 2002) ("The fact

---

[14] These concerns are even more pressing as to Defendant's argument here.  Under Defendant's theory, authorization by the owner of a trade secret, even if unknown to the defendant, would stymy any charge of conspiracy.  Thus, government agents would be unable to conduct undercover operations because every such operation would necessarily involve agreement by the owner of the information to allow the target of the investigation to obtain, use, or possess the information.

that the information they conspired to obtain was not what they believed it to be does not matter because the objective of the [defendants'] agreement was to steal trade secrets, and they took an overt step toward achieving that objective."); United States v. Martin, 228 F.3d 1, 13 (1st Cir. 2000) (rejecting challenge to conspiracy to convert trade secrets conviction on ground that defendant received no actual trade secrets); United States v. Weiqiang Zhang, No. 13-20134-01-CM, 2017 WL 3168955, at *2 (D. Kan. July 26, 2017) ("The government was not required to prove that the stolen seeds actually contained trade secrets.  It was only required to prove that defendant and his co-conspirators believed that they would be stealing a trade secret.") (citing Hsu, 155 F.3d at 203–04, in support) ; United States v. Dimson, No. 1:06-CR-313-JOF-GGB, 2006 WL 8444641, at *1 (N.D. Ga. Sept. 21, 2006) ("While the government must prove that defendants agreed to steal and sell trade secrets, given the nature of the conspiracy charge, the government need not prove that particular items were in fact trade secrets.").

The Court agrees with these decisions.  To be sure, Defendant raises a slightly different legal impossibility argument than that addressed in Hsu and the cases cited above.  In those cases, the defendants argued that it was impossible to achieve their unlawful aims because the information they sought to steal was not in fact a trade secret.  Here, Defendant argues that it was impossible for he and his coconspirators to achieve their unlawful aims because the information they sought to steal was authorized.  Nonetheless, the same reasoning applies.  The actual status of the documents (whether they constituted a trade secret or whether they were authorized) is immaterial.  It is the conspirators' *belief* about the status of the documents that controls.

The Court agrees with the reasoning and holding of every court it has found to have addressed this issue.  Impossibility, whether legal or factual, is not a defense to a charge of

conspiring to steal trade secrets under the EEA.  Thus, it would have been wholly improper to allow Defendant to offer an impossibility argument to the jury.

### D.   Defendant's Impossibility Argument Contradicts the Agreed-Upon Jury Instructions.

Further stymying Defendant's argument is that his argument contradicts the jury charges that the parties agreed upon.[15]  Defendant did not seek an instruction, and the Court did not issue one, that required the Government to prove that Defendant and his coconspirators were not authorized to take, possess, or use Gulfstream's trade secrets.  To the contrary, the Court instructed the jury that the Government need only prove, that "the defendant *believed* that he or one of his alleged co-conspirators was taking the information without authorization from its rightful owner." (Doc. 139, p. 188 (emphasis supplied).)

When issuing instructions regarding the elements the Government must prove—which, again, the parties agreed upon—the Court stated:

> [t]he government must prove the following beyond a reasonable doubt before you may find the defendant guilty of Count 1:
> First, there was an agreement between two or more persons to convert a trade secret by (a) taking it without authorization, (that is, to steal, take, carry away or conceal the information by fraud, artifice or deception); or (b) copying, duplicating, sketching, drawing, photographing, downloading, uploading, altering, destroying, photocopying, replicating, transmitting, delivering, mailing, communicating or otherwise conveying the information without authorization; or (c) receiving, buying or possessing the information knowing it to have been stolen, appropriated, obtained or converted without authorization. . . .
>
> Second, that the defendant knowingly and voluntarily became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

---

[15] The Court held multiple conferences regarding the jury instructions.  At the final conference, (doc. 139, pp. 4–11), the Court and the parties reviewed the Second Draft of the Court's Instructions to the Jury, (doc. 108).  Defendant had no objections to the Second Draft, (see doc. 139, pp. 4–11), and the Court's final instructions comported with those instructions with minor agreed-upon changes, (id at pp. 177–93.)

35

Third, that the defendant acted with the intent to convert the information to the economic benefit of himself or another, knowing or intending that this would injure the rightful owner of the information.

Fourth, that a member of the conspiracy performed at least one overt act for the purpose of carrying out or helping the conspiracy.

And, fifth, that the information was related to or included in a product that is produced for or placed in interstate or foreign commerce.

(Id. at pp. 185–86.)  The Court's instructions focused, appropriately, on the Defendant's and his coconspirators' agreement as to authorization rather than whether they had actual authorization to take, possess, and use Gulfstream's trade secrets.  This was a correct statement of the law because "[r]elying on the defendant's mental state to establish the necessary federal elements amounts in the end to little more than the traditional maxim that conspiracy punishes the guilty mind, and that the crime is not vitiated by mere factual impossibility."  White, 597 F. Supp. 2d at 1271.  It was enough, under the agreed upon instruction, if Defendant entered into an agreement to convert a trade secret, and Defendant's proposed impossibility argument sought to add an element that had no basis in those instructions.

Similarly, the Court did not charge the jury that the Defendant and his coconspirator's plan must have had a chance of success or that it must have resulted in conversion of a trade secret if carried out.  Quite the contrary, the Court stated, "[a]gain, the crime of conspiracy is the agreement to do something unlawful.  It does not matter whether the crime agreed upon was committed." (Doc. 139, p. 186.)  The Court further explained,

As I stated above, the government need not prove that the defendant actually knew the anti-ice and wing model information met the legal definition of a trade secret. With regard to that element of the offense, the government need only show that the defendant believed that the rightful owner of the information treated the information as secret and, also, *the defendant believed that he or one of his alleged co-conspirators was taking the information without authorization from its rightful owner.*

36

(Id. at p. 188 (emphasis supplied).)  By agreeing to these charges, Defendant in essence conceded that legal impossibility was no defense to the charge against him.  Defendant agreed that it was enough for the Government to prove that he "believed he or one of his co-conspirators was taking the information without authorization," (id.), and thereby agreed that the Government did not have to prove that they actually did not have authorization.  Likewise, he accepted that it was unlawful to agree to convert information the conspirators believed was a trade secret, even if it was not actually a trade secret.[16]

To be sure, the Court instructed the jury, pursuant to the pattern jury instruction and at the parties' request, that "[i]t's a separate federal crime for anyone to conspire or agree with someone else to do something that would be another federal crime if it was actually carried out."  (Doc. 139, p. 183); see Pattern Crim. Jury Instr. 11th Cir. OI O13.1 (2020).  Defendant repeatedly argues in his Motion that this instruction opened the door for his impossibility argument and that the Court improperly precluded him from offering argument based on that instruction.  (Doc. 140, pp. 8, 17, 18, 19, 26, 27, 28, 30.)  He even contends that "[t]he 'separate crime' element is an element of the offense, that th[e] prosecution had to prove beyond a reasonable doubt."  (Id. at p. 27.)  Defendant misconstrues one cherrypicked sentence.  The entire portion of the instruction he cites stated,

> Note that the defendant is not charged in Count 1 with committing a substantive offense.  He is charged with conspiring to commit that offense.
> I will give you specific instructions on conspiracy.  It's a separate federal crime for anyone to conspire or agree with someone else to do something that would be another federal crime if it was actually carried out.  A conspiracy is an agreement by two or more people to commit an unlawful act.  In other words,

---

[16] The EEA does not prohibit appropriating information that is not a trade secret any more than it prohibits taking, possessing, and using a trade secret that one is authorized to take, possess, and use.  Consequently, the outcome must be the same if the conspirators agreed to convert a trade secret they believed they had no authority to take, possess, or use even if they actually had that authority.  Put another way, it would have been incongruous and improper to allow Defendant to argue impossibility of committing the substantive offense as to one element (specifically, authorization) when he had conceded that such impossibility was no defense as to another element (specifically, that the information constituted a trade secret).

> it is a kind of partnership for criminal purposes.  Every member of a conspiracy becomes the agent or partner of every other member.

(Doc. 139, p. 183.)   Read in this context, as well as in conjunction with the Court's other instructions, this instruction merely introduced the jury to the concept of conspiracy.  Moreover, the sentence Defendant cites did not require the Government to prove that Defendant and his coconspirators' plan had an objective chance of success.  Rather, it focused on the lawfulness of the acts Defendant "agree[d] to do."  Again, Defendant asserts he would have argued to the jury that he could be acquitted even if the act he agreed to do was "to obtain these documents without Gulfstream's permission."  (Doc. 140, p. 8.)  That act is unquestionably a separate federal crime. Thus, Defendant's proposed argument contradicts the very charge he cites.

Allowing Defendant to make his impossibility argument to the jury would have exceeded the "principles that [would] later be incorporated and charged to the jury."  Trujillo, 714 F.2d at 106.   This provides yet another independent reason for disallowing his argument as legally untenable.

## IV.   Even if Defendant's Argument was Proper, Impossibility was not an Issue for the Jury to Decide.

Defendant has not cited any case where a jury decided an impossibility defense.  Rather, in every pertinent case Defendant cites, the arguments regarding impossibility were decided by the court.  See Oviedo, 525 F.2d at 885–86 (reversing conviction for attempted distribution of heroin); McInnis, 601 F.2d at 1323–27 (affirming district court dismissal of conspiracy charge).  Likewise, every decision that the Court has found that recognizes legal impossibility applies the defense as a matter of law for the court to decide and not as an issue for the jury.  See, e.g., United States v. Chavez, 29 F.4th 1223, 1228 (10th Cir. 2022) (assuming that legal impossibility is defense to attempted bank robbery charge, if defendant's attempt would not have violated federal bank

robbery statute, "it follows that the indictment . . . would fail to state an offense and be subject to dismissal"); <u>Fernandez</u>, 722 F.3d at 31–35 (reversing conviction on grounds of "pure legal impossibility" and declining to remand for further proceedings).

It is unsurprising that courts, not juries, have decided questions of legal impossibility. After all, if the impossibility is purely legal in nature, it would be a question of law for a court, not a jury, to decide. <u>United States v. Duncan</u>, 356 F. App'x 250, 253 (11th Cir. 2009) ("[T]he determination of pure questions of law in criminal cases are not the province of the jury.") (citing <u>United States v. Gaudin</u>, 515 U.S. 506, 513–14 (1995)). Moreover, as explained above, cognizable legal impossibility defenses hinge on the scope of a statute's proscription, and "[i]t is emphatically the province and duty of the judicial department to say what the law is." <u>Marbury v. Madison</u>, 5 U.S. 137, 178 (1803); <u>see also</u>, <u>United States v. Vidaure</u>, 861 F.2d 1337, 1340 (5th Cir. 1988) (whether defendant's prior conviction met definition of violent felony was statutory interpretation to be determined by judge); <u>United States v. Chugay</u>, No. 21-10008-CR, 2022 WL 1782583 at *3 (S.D. Fla. June 1, 2022) ("statutory interpretation is a question of law for the Court to decide") (citing <u>Williams v. Homestake Mortg. Co.</u>, 968 F.2d 1137, 1139 (11th Cir. 1992)). Thus, even if Defendant's argument constitutes a viable legal impossibility defense, it would have been inappropriate for him to make that argument to the jury. <u>See id.</u> (precluding defendant from arguing that employing aliens cannot constitute harboring under charged statute because argument was one of statutory interpretation for court).

Submitting Defendant's argument to the jury would be particularly problematic in this case given that he hangs his impossibility arguments on his interpretation of the PIA. Questions of contract are generally questions of law for the Court, not the jury, to decide. <u>Tims v. LGE Cmty. Credit Union</u>, 935 F.3d 1228, 1237 (11th Cir. 2019) ("Questions of contract interpretation are pure

questions of law . . . ."); <u>Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.</u>, 832 F.3d 1318, 1322 (11th Cir. 2016) ("Contract interpretation and statutory construction present questions of law . . . .").  To this point, Defendant argued in support of his Rule 29 Motion that "contract interpretation is a matter for the Court.  The Court, and in this case not the jury, is charged with interpreting this contract and applying the contract to the facts of the case." (Doc. 137, p. 256.) He reiterated that his impossibility defense was "a question for the Court, as to whether or not Mr. Martinez's possession and use of the documents is within the PIA's definition of authorized." (<u>Id.</u> at p. 257.)  Defendant continues to argue in his Motion for New Trial that "[t]he PIA had its effects as a matter of law in defining the status of the documents." (Doc. 140, p. 28.)  Defendant fails to explain why the Court should have allowed him to present an issue to the jury which he has repeatedly stated is a question of law for the Court.

For all these reasons, even if Defendant had stated a cognizable legal impossibility defense, it would have been inappropriate and confusing for him to present that defense to the jury.

## V.      The Facts do not Support Defendant's Impossibility Argument

Even assuming Defendant proposed a legally viable impossibility defense, the undisputed facts do not support it.[17]  <u>C.f.</u> <u>United States v. Joiner</u>, 418 F.3d 863, 869 (8th Cir. 2005) ("Even if we assume, *arguendo*, legal impossibility is a defense to a conspiracy charge, . . . the district court did not abuse its discretion in refusing to instruct the jury on this defense, because the evidence

---

[17] At trial, the Court did not base its ruling disallowing Defendant's impossibility argument on the lack of factual support or its interpretation of the PIA. (<u>See</u> doc. 139, pp. 55–61.)  Rather, the Court ruled that the argument was legally invalid.  (<u>Id.</u>)  To that point, the Court allowed Defendant to argue that the PIA permitted Defendant and the other members of the APAC team to take, possess, and use Gulfstream's trade secrets.  (<u>Id.</u> at pp. 128–29.)  The Court drew the line at Defendant arguing that it was impossible for him to commit the offense of conspiracy because of the PIA's authorization.  (<u>Id.</u>)  For the multitude of reasons set forth above, that ruling was correct even assuming, *arguendo*, that the impossibility argument was factually supportable.  In this Section, the Court lays out the "flip side" of that analysis: even assuming Defendant's impossibility argument was legally tenable, it was not factually supportable.

did not support the requested instruction.") (internal citations omitted) (citing United States v. Hatcher, 323 F.3d 666 (8th Cir. 2003); United States v. Willis, 277 F.3d 1026 (8th Cir. 2002)).

The purpose of the PIA was to safeguard the parties' proprietary information from unauthorized use and disclosure. (J. Tr. Exh. 21, p. 1.) It is paradoxical for Defendant to argue that the agreement provides him safe harbor even if he intended to violate its purpose and "obtain and use [Gulfstream's] documents without [Gulfstream's] permission." (Doc. 140, p. 11.) Defendant's Motion for New Trial sheds no light on this contradiction, as he did not cite to the PIA in his Motion or Reply, much less analyze the agreement's language. In support of his Rule 29 argument on the same issue, Defendant argued that "the uses to which Mr. Martinez is alleged to have been putting these documents, namely, preparing a wind tunnel testing plan, were squarely within the scope of what the proprietary information agreement allows and contemplates." (Doc. 137, pp. 231–32.) Defendant reads the PIA far too broadly and the facts of this case far too narrowly.

### A. The PIA Applies to Information that was "Disclosed" Between Gulfstream and APAC, and Gulfstream did not Disclose the Documents underlying Defendant's Charges.

Through the PIA, Gulfstream did not give carte blanche permission for APAC to take, possess, and use any Gulfstream proprietary information that APAC could get its hands on. Nothing in the PIA took away Gulfstream or APAC's ability to choose which documents to provide to the other party. Quite the contrary, the agreement specified that "[n]either Party has an obligation to disclose PROPRIETARY INFORMATION hereunder." (J. Tr. Exh. 21, p. 6.) The PIA spelled out how proprietary information should be handled, protected, and safeguarded when one party "disclosed" such information to the other party. (Id. at p. 1.) Thus, under the PIA's plain language, in order for APAC to have authority to possess, use, or disclose Gulfstream's proprietary

information under the agreement, Gulfstream must have "disclosed" the information to APAC. The PIA's use of "disclose" and "disclosure" implies one party committing "some affirmative, voluntary act" to make information in its possession known to the other party.  See, In re Anthem, Inc. Data Breach Litig., 162 F. Supp. 3d 953, 1002–05 (N.D. Cal. 2016).

In his Motion, Defendant did not mention this threshold requirement of the PIA, much less cite any evidence that Gulfstream disclosed the documents at issue to APAC.  The Court has no obligation to sift through the record to craft Defendant's argument for him.  Regardless, the undisputed evidence shows that Gulfstream did not disclose to APAC the trade secrets underlying the charges against Defendant.  Rather, Basaldua, acting on behalf of APAC, took that information from Gulfstream and shared it with Defendant and his other coconspirators.  To be sure, Basaldua was an employee of Gulfstream.  However, objectively, Basaldua indisputably was not operating under any authority from Gulfstream when he took the company's trade secrets and then provided them to Defendant and his other coconspirators.  The evidence to this point is voluminous, and the Court merely summarizes some of it below.

Chiefly, the unambiguous language of the PIA thwarts any argument that the agreement authorized Basaldua to provide proprietary information to APAC.  Paragraph 15 of the PIA specified that APAC was to receive information under the agreement only from Wright.  (J. Tr. Exh. 21, p. 8.)  Defendant does not explain why the Court should ignore this explicit provision. Nor could he.  Defendant cannot seek shelter under the PIA but then ask the Court to disregard its plain terms.

Even if the Court were to look past the plain and unambiguous language of the PIA, the undisputed evidence proves that Gulfstream did not authorize Basaldua to disclose proprietary information to APAC. [18]

Basaldua's financial interest with APAC created a conflict of interest that prevented him from legitimately representing Gulfstream in interactions with APAC. (Doc 137, pp. 17–18.) Defendant's own expert testified that the Government proved that Basaldua should not have been working with both APAC and Gulfstream:

> I think it[] pretty much has been shown that someone in this -- that was involved in this particular situation was working for two companies at the same time and that they sent information to another person with whom they were working on this collaborative effort, and in working on the collaborative effort and for the company that was then employing them, they would have an ethical situation, I guess, that they should not have had.

(Doc. 139, p. 37.) Indeed, Gulfstream was unaware that Basaldua was working with APAC, and when asked by Gulfstream, Basaldua denied any such involvement. (Doc. 135, pp. 191–92; doc. 137, pp. 17–18.) Defendant testified that he knew Basaldua had a financial interest in APAC, and he knew that, at least early on, Basaldua had not disclosed his relationship with APAC to Gulfstream. (Doc. 138, pp. 212, 215–16.) Defendant further averred that while he previously did not think Basaldua had a conflict of interest in the APAC and Gulfstream interactions, he eventually came to understand that Basaldua operated under a conflict of interest. (Id. at p. 293.)

Defendant's additional testimony confirmed that Basaldua was not disclosing documents to APAC under any authority from Gulfstream. Defendant admitted that he eventually came to understand that Gulfstream and APAC were not in a partnership. (Id. at pp. 291–93.) Defendant

---

[18] During the Rule 29 argument, Defendant argued that Basaldua's violations of Gulfstream's policies "do[] not take those documents outside the realm of the PIA." (Doc. 137, p. 257.) However, as noted above, for Basaldua's provision of documents to APAC to be within the "realm of the PIA," that provision would have to amount to a disclosure attributable to Gulfstream. Basaldua's violations prove that he operated under no such authority.

also testified that only Chee would have the authority to contract with Gulfstream on behalf of APAC and that Defendant assumed Chee was not aware that members of the APAC team were taking documents from Gulfstream.  (Id. at pp. 250–51.)  Defendant agreed that during his November 30, 2018, phone call with Basaldua, he learned that Basaldua "had been stealing Gulfstream information."  (Id. at p. 299.)

Likewise, Gulfstream did not authorize someone in Basaldua's position to disclose proprietary information to a company in APAC's position.  (Doc. 137, pp. 18, 51, 187–88.)  For instance, when asked whether Gulfstream engineers send proprietary information to vendors, Gulfstream engineer Paul Zellner testified, "No.  And we've got import/export rules.  So we know it's up to being dismissed that you don't ever send data out.  You send it to your procurement person, and they decide who they can send to."  (Id. at p. 188.)  Wright testified, "[a]n engineer is never supposed to be emailing or giving any information to a supplier.  It's supposed to always funnel through procurement."  (Id. at p. 18; see also id. at p. 12 (engineer directly sending proprietary information "would have been in direct violation of corporate policy").)  Indeed, Gulfstream terminated Basaldua's employment after it discovered that he had sent documents to Defendant and his other conspirators.  (Doc. 136, pp. 93–94.)

Not only did Gulfstream prohibit potential vendors such as APAC from receiving proprietary information from engineers such as Basaldua generally, but they also prohibited APAC from doing so specifically.  In January 2018, Wright emailed APAC, "[i]f you have further questions and/or comments please contact me directly.  Engineering requested all communication come through myself/procurement first and I will be sure to pass along any further action items, so please do not contact them directly."  (J. Tr. Exh. 24.)  Basaldua shared Gulfstream's trade secrets with Defendant and the other members of the APAC team months after this email.  (See,

e.g., J. Tr. Exhs. 10, 19, 20.)  Those disclosures clearly were not pursuant to the PIA as they violated the directive of Wright, the only person the agreement designated to speak on behalf of Gulfstream.

The timing of Basaldua's provision of Gulfstream's trade secrets to APAC also thwarts any notion that his communications could somehow be attributed to Gulfstream and thereby fall under the coverage of the PIA.  Again, Basaldua sent Gulfstream's trade secrets to Defendant after Wright relayed to APAC that it was not interested in pursuing APAC's anti-ice technology and that Gulfstream could not discuss with APAC its internal efforts.  (See J. Tr. Exh. 24.)  Even Defendant admitted that at, as of June 2018, he knew that Gulfstream was not interested in using APAC's technology for the G650 aircraft, the only purpose contemplated by the PIA.  (Doc. 138, p. 287.) It defies logic to argue that Basaldua somehow disclosed the documents to APAC for the purpose of Gulfstream's pursuit of technology that Gulfstream had already rejected.

The manner in which Basaldua sent Defendant and his other coconspirators Gulfstream's trade secrets also proves he was not disclosing the information on behalf of Gulfstream. Gulfstream maintained processes for the selection, redaction, and exchange of authorized disclosures of proprietary information to outside companies such as APAC.  (Doc. 137, pp. 7–14, 59, 185–88.)  Gulfstream followed this process as to the documents that were legitimately disclosed to APAC pursuant to the PIA.  (Id. at pp. 23–26, 33.)  However, Basaldua did not follow this process in any way as to the documents that underly the charges against Defendant.  Once again, Defendant's own evidence foils any argument that Basaldua disclosed APAC's documents under the PIA or with any authority from Gulfstream.  Defendant's expert witness testified that legitimate exchanges of proprietary information would not occur in the manner in which Basaldua sent Gulfstream's trade secrets to Defendant.  (Doc. 139, pp. 33–35.)  Defendant also testified that there are "normal channels" for sharing proprietary information and that the way Basaldua

provided him documents was not "normal." (Doc. 138, pp. 203–207.) Critically, Defendant conceded that Gulfstream "corporate policy dictates" that employees do not "email trade secret information out of Gulfstream" and that such information would have to be sent through a secure portal. (Id. at p. 246.) Defendant admitted that, contrary to Gulfstream's policies, he and Basaldua used "tradecraft" methods to disguise the content of their communications containing Gulfstream's proprietary data. (Id. at pp. 264–65.)

Put simply, the evidence, including Defendant's own testimony, does not support any notion that Gulfstream "disclosed" to APAC the trade secrets underlying the charges against Defendant. Consequently, those trade secrets did not fall within the ambit of the PIA. As such, Defendant's argument that the PIA authorized him and his coconspirators to obtain, use, and possess the trade secrets underlying the charges against him was factually unsupportable.

**B.     Defendant and his Coconspirators Indisputably Agreed to Use and Disclose Gulfstream's Trade Secrets for Purposes and in Ways Other than those Permitted by the PIA and RFI**.

Even if the documents Basaldua took from Gulfstream fell within the ambit of the PIA, the agreement did not authorize APAC to use and disclose them for any purpose they chose and in any manner they desired. Rather, the whole purpose of the PIA was to limit the use and disclosure of information exchanged between the parties. APAC's conversion of Gulfstream's trade secrets far exceeded the authorization set forth in the PIA and RFI.

Perhaps the most glaring reason that Defendant's possession and use of Gulfstream's documents was not authorized by the PIA is that Defendant was unaware of the agreement. Section 4A of the PIA specified that Gulfstream's proprietary data could only be disclosed to individuals who had been made aware of the agreement's restrictions. (J. Tr. Exh. 21, p. 4.)

Additionally, APAC indisputably used Gulfstream's trade secrets for purposes other than those permitted by the PIA.  The PIA allowed for the exchange of "technical information and proposals related to the wing leading edge components and Installation for power consumption for potential use on the G650 aircraft (the 'Permitted Purpose')."  (Id. at p. 1.)  The PIA specified that information disclosed under the agreement be used "solely in furtherance of the Permitted Purpose with the Disclosing Party."  (Id. at p. 4.)  Additionally, under the RFI "[a]ll information, documents and specifications furnished by Gulfstream in this RFI, and the RFI itself, are Gulfstream confidential, and may not to [sic] be used for any other purpose than the intended purpose which is the solicitation of a proposal from the bidder by Gulfstream."  (J. Tr. Exh. 22, p. 6.)

Well after Wright's January 8, 2018, email, the APAC team continued to obtain, possess, and use Gulfstream's proprietary information in support of work on their own anti-ice system.  The evidence, including Defendant's own testimony, proves that the APAC team indisputably sought to market that system to Gulfstream's competitors.  Defendant admitted that he told law enforcement agents that "the reason APAC wanted this Gulfstream data was simply to get its FAA-certified data so it could market the anti-ice project to numerous aircraft companies."  (Doc. 138, p. 277.)  He specifically admitted that if APAC had developed a proof of concept, it might have sold the technology to Gulfstream's competitors.  (Id. at p. 278.)  To that point, Pascua texted Basaldua that one of Gulfstream's competitor's aircraft equipped with "our [(APAC's)] anti-ice would put Gulfstream out of business."  (Doc. 136, p. 250; J. Tr. Exh. 36, p. 15.)

During oral argument on Defendant's Rule 29 motion, Defendant's counsel agreed with the Court that there was evidence that "APAC, as a company, those who were entitled to act on behalf of APAC, contemplated and perhaps took steps towards using the documents for things other than just potential use on the G650."  (Doc. 137, pp. 238–39.)  However, counsel stated that individuals

47

other than Defendant had that intention and Defendant's sole purpose was "working solely on the wind tunnel test program." (Id. at p. 239.) This is a non sequitur.

Defendant has repeatedly represented that his impossibility argument hinges not on his and his coconspirators' subjective intent but on the objective scope of the PIA's authorization. APAC's unquestioned use of Gulfstream's trade secrets to develop technology for Gulfstream's competitors pulls that use outside of the PIA's authorization. Moreover, even if the coverage of the PIA could somehow be influenced by Defendant's intent, he admitted that he and his coconspirators indisputably agreed to use Gulfstream's trade secrets for purposes other than those permitted by the PIA and RFI. Defendant conceded that APAC's intent for the wind tunnel test program "was to get certified wind tunnel data to use to market to a variety of companies." (Doc. 138, p. 279.) Thus, for Defendant to argue that he only agreed to work on a test program is akin to bank robbers' getaway driver contending that he only agreed to drive a car. Additionally, as laid out above, Defendant understood in June 2018 that APAC was not developing anything for the G650 program, the only purpose permitted by the PIA. (Id. at pp. 284–87.) Defendant also admitted that after his November 30, 2018, phone call with Basaldua "[he] knew something was wrong and that [Basaldua] might have stolen [Gulfstream's data]." (Id. at pp. 300–01.) Nonetheless, Defendant knowingly left Gulfstream's trade secret information in the test plan, which he sent to Chee so that APAC could submit it to the FAA. (Id. at p. 300.) Thus, once again, Defendant's own testimony sinks his counsel's argument.

Defendant's testimony dooms the factual basis for his impossibility argument in other respects. Defendant conceded that he sent Gulfstream's proprietary data to numerous people who he knew had no right to view or use that data. (Id. at p. 274–76.) These disclosures exceeded the bounds of Section 4A of the PIA which limited disclosure to those "who have a 'need to know' in

order to carry out their respective functions in connection with the Permitted Purpose." (J. Tr. Exh. 21, p. 4.)  Defendant also ran afoul of the PIA's prohibition against disclosure "to any third party without the express written consent of the Disclosing Party." (Id. at p. 2.)  Additionally, Defendant acknowledged that he and Basaldua purposefully misnamed Gulfstream's trade secret information to "hide and disguise proprietary information." (Doc. 138, pp. 263–65.)  In so doing, Defendant and his coconspirators failed to comply with Paragraph 2(C) of the PIA, which required any documents to be marked conspicuously as proprietary information.  (J. Tr. Exh. 21, p. 2.)

For all these reasons, there was simply no evidence from which the jury could have determined that the PIA authorized Defendant and his coconspirators to obtain, possess, and use Gulfstream's trade secrets for the purposes and in the methods that they agreed upon.

## CONCLUSION

For the multitude of reasons set forth above, Defendant's impossibility argument was neither legally tenable nor factually supportable.  Accordingly, the Court committed no error in barring Defendant from presenting that argument to the jury, and the Court **DENIES** Defendant's Motion for a New Trial, (doc. 125).

**SO ORDERED**, this 15th day of December, 2023.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA